BRENDA LEE EDWARDS ET AL. *v.* GEORGE
A. CHADWICK, JR.

[No. 864, September Term, 1973.]

*Decided July 17, 1974.*

The cause was argued before ORTH, C. J., and MORTON and GILBERT, JJ.

*Samuel D. Hill,* with whom were *Richard E. Zimmerman, John F. Foley, Jr.,* and *Buckmaster, White, Mindel & Clarke* on the brief, for appellants.

*Phillip L. Goldsborough, III,* with whom were *Michael A. Pretl* and *Smith, Somerville & Case* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

This appeal concerns the liability of a lessor of land with respect to persons outside the land who suffer physical harm by reason of a condition of the land or by reason of activities of lessees of the land. At issue is the applicability of §§ 379 and 379A, Torts 2d, *Restatement of the Law.*

Section 379 reads:

> "A lessor of land who transfers its possession in a condition which he realizes or should realize will involve unreasonable risk of physical harm to

others outside of the land, is subject to the same liability for physical harm subsequently caused to them by the condition as though he had remained in possession."

Section 379A reads:

"A lessor of land is subject to liability for physical harm to persons outside of the land caused by activities of the lessee or others on the land after the lessor transfers possession if, but only if,

(a) the lessor at the time of the lease consented to such activity or knew that it would be carried on, and

(b) the lessor knew or had reason to know that it would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken."

The question on appeal is presented in the context of the charge to the jury. Appellant claims that the refusal of the court to instruct under § 379 was prejudicial error.

*Statement of the Case*

BRENDA LEE STOWERS (Brenda) and CHARLES W. STOWERS, JR. (Charles), her husband,[1] filed an action on 23 October 1970 in the Circuit Court for Frederick County against FRANCIS E. SCHUSTER and GEORGE A. CHADWICK, JR. In Case 1 of the Declaration Brenda sued Schuster and Chadwick, alleging that on 8 March 1970 while she was operating her auto south on State Route 28, a public highway in Frederick County, at night in open country, she received personal injuries and her auto was damaged "when it collided with a dark colored horse standing in, crossing, or wandering along the southbound lane and went out of control and into a pole across the highway." Count I averred: "because of the negligence of the Defendant Schuster, who

---

1. A docket entry under date of 16 May 1973 reads: "Motion of Plaintiff to change name of Brenda Lee Stowers to Brenda Lee Edwards granted by Court (Associate Judge Robert E. Clapp, Jr.)." The motion is not included in the record before us.

owned or controlled this horse which had wandered onto the road from the adjoining field (part of an entire farm known as 'Rock Hall') owned by the Defendant Chadwick and leased and used by the Defendant Schuster for keeping livestock, including horses, in failing to maintain proper fencing around the fields where his livestock grazed, and especially along this highway and in allowing his animals or those under his control to wander from his land onto and across the highway, even after repeated warnings and requests to repair the fence or otherwise keep his animals on his land, and because of the negligence of the Defendant Chadwick, as owner of this farm, in leasing it to the Defendant Schuster, knowing that it was going to be used for the keeping of animals and that there were numerous places where the fence was down or so in disrepair that animals could get out on the adjacent highway causing a dangerous situation and nuisance for drivers on the highway". Count II averred: "and because the Defendants, as owner and lessee of this farm, created and allowed a public nuisance on this highway by not repairing this fencing before or during the entire period of the lease, so that the animals owned or controlled by the Defendant Schuster could wander from this farm onto the highway into the path of traffic". Alleging that her injuries, losses and expenses were caused directly by the negligence and nuisance of Schuster and Chadwick, without any negligence on her part contributing, Brenda claimed $150,000. In Case 2 Charles alleged that while riding in the auto operated by his wife, he received personal injuries and suffered expenses as a direct result of the negligence and nuisance of Schuster and Chadwick as set out in Case 1. He claimed $25,000. In Case 3 Brenda and Charles sued Schuster and Chadwick "because their marriage lost and will lose the services each would have provided, had they not been injured as a direct result of the negligence and nuisance of the Defendants, as more particularly stated in the allegations of the Declaration in Case 1, . . . ." They claimed $25,000. Schuster's plea, in essence, denied his alleged negligence, responsibility and liability while Chadwick pleaded the general issue to "each and every count of the declaration".

After a flurry of discovery procedures, during which the court denied Brenda's motion to amend the declaration to increase the amount of her alleged damages to $350,000, trial before a jury commenced on 16 May 1973 and testimony was heard for two consecutive days. At the conclusion of all the testimony, and after the submission of written prayers on behalf of plaintiffs and Chadwick, the court held a conference in chambers at which both Schuster and Chadwick moved for directed verdicts. The court reserved decision on the motions and entertained discussion on the prayers submitted. On 18 May 1973, prior to the court's rendering its instructions, another conference in chambers resulted in the determination that the case be submitted to the jury on issues for the return of a special verdict. Maryland Rule 560. Trial reconvened, the jury was instructed by the court, the issues for their consideration were read, exceptions to the instructions were noted out of the jury's presence, further instructions were given, counsel presented their closing arguments, and the case went to the jury. The jury found on the issues submitted:

1) the horse which was struck by Brenda's auto was owned or under the control of Schuster.

2) Schuster knew or had reason to know on the date of the accident that the use he was making of the farm would involve an unreasonable risk of harm to persons lawfully using the adjoining highway, Route 28.

3) the unreasonable risk was a proximate cause of the accident.

4) Chadwick did not know nor did he have reason to know at the time he leased the farm to Schuster in March, 1968, that the use of the farm by Schuster would unavoidably involve an unreasonable risk of harm to persons lawfully using the adjoining highway, Route 28, and that the tenant would not cure such unreasonable risk.

5) Brenda was not guilty of any negligence which directly contributed to the happening of the accident.

The jury assessed damages in favor of Brenda in the amount of $75,000, and in favor of Charles in the amount of $5,000. On 18 May 1973 judgments nisi were entered in favor of Brenda against Schuster for $75,000, in favor of Charles against Schuster for $5,000 and in favor of Chadwick. On 21 May judgments absolute were entered as to Brenda and Charles against Schuster. On 31 August, upon hearing, a motion for a new trial filed on 21 May by Brenda and Charles as to Chadwick was denied, and judgment absolute entered in favor of Chadwick. On 27 September Brenda and Charles filed an appeal from the judgment in favor of Chadwick.[2]

## The Evidence Adduced

We give a compendium of the evidence adduced. The Chadwick farm of approximately 300 acres was leased by Schuster. It is generally located on the east side of Route 28 in Frederick County, north of Dickerson, Maryland and the Montgomery County line and just south of the Monocacy River. The farm is variously known locally as the Belt Farm, Rock Hall Farm or the Shiloh Dude Ranch and contains a main house, barn and yard, tenant house and various outbuildings. Apparently five fields of the approximately 300 acre farm were enclosed by fencing at various times and were used by successive tenants. The three fields contiguous to Route 28 (running north-south) were apparently used in recent years more for the cultivation of grain crops than the pasturing of animals. The property had been vacant for several months before Schuster leased it on 15 March 1968. Chadwick said that Schuster leased the farm for the purpose of keeping horses and that Schuster stated that he wanted "to run a dude ranch [3] like was run there before". The terms of the lease, in addition to the payment of rent and the making of certain structural repairs to the

---

**2.** The record before us does not disclose an appeal with respect to the judgments as to Schuster.

**3.** *The American Heritage Dictionary of the English Language*, 1973 ed., defines "dude ranch" as "a resort patterned after a western ranch, featuring camping, horseback riding and other outdoor activities."

buildings, provided *inter alia* that Schuster as lessee would make ". . . any minor repairs, improvements or alterations . . . without the prior approval of . . ." Chadwick and that he, Schuster, could ". . . cut specified trees to provide the necessary posts for fencing".

Chadwick testified that at the time he leased the property he knew that not every field had a "tight" fence but that "there were five fenced fields". He believed that the "southernmost of the three front fields" bordering Route 28 (south field) was "in the poorer condition" in terms of fencing but that the northernmost field had an excellent woven wire fence with a strand of barbed wire on the top and that the middle field had a fence "not really as strong" made of 30 inch hog wire with two strands of barbed wire on top. The two back fields were, in Chadwick's view, adequately fenced to contain horses. Apparently recognizing that the fencing would require periodic repair, realizing that some fencing was damaged during the winter and knowing that it was Schuster's responsibility under the lease to make repairs, Chadwick provided Schuster with two rolls of barbed wire for fence maintenance soon after he took possession. Chadwick related he told Schuster ". . . that if he needed additional material or more barbed wire that [he] would be glad to furnish it."

Schuster testified that he knew the fencing of the south field along Route 28 was in poor condition when he took possession. He described the fence and his efforts at repair: "There was wire there and it was covered with honeysuckle and stuff and I pulled that up and renailed it to the post and I put a strand of barbed wire down the top of it." He also closed up three gaps [4] in the fence and put in "some" new posts.

Despite Schuster's efforts, his repairs were seemingly to no avail. Shortly after he introduced horses to the farm — a few months after taking possession — according to the

---

4. When questioned by the court, Schuster agreed that a "gap", as the word is generally used, refers to an "informal gate" that could be opened and closed for the ingress or egress of animals. Schuster also referred to a gap as a West Virginia gate.

testimony of various neighbors, Schuster's horses were frequently on adjoining properties or wandering free. Robert J. Pryor, who lived on the farm just opposite Schuster, on the west side of Route 28, across from the deteriorated fencing of the south field, testified that Schuster used the field for grazing and that horses wandered through a hole in the fence just opposite his land and through an opened gap, crossed Route 28 and into his field. Pryor testified that sometimes there were as many as "3 to 13 or 14 horses" in his alfalfa fields bordering the highway "quite a few times every week". In his view, the fence was in such "very poor" condition that "the horse would rub against it, it would break and they would have a hole that they could get through". Perry Pryor generally corroborated his father's testimony concerning the poor condition of the fence, its inadequacy to hold horses and the fact that Schuster's horses were frequently without the confines of his fields. That testimony was confirmed either in whole or in part by other witnesses.[5]

On the evening that the accident giving rise to this case occurred, Brenda was driving south on Route 28 with Charles as a passenger in the right front seat when, without warning, a horse appeared in their lane from the side of the highway. Charles testified that he "hollered, watch that horse", "the horse hit the car", and "the car kept going until it finally stopped". The investigating officer, Trooper Fred Yeager, testified that when he arrived on the scene "there was a horse lying in the southbound right-hand lane of traffic and on the left shoulder which would be westbound

---

5. For example: Raleigh N. Jarman when asked the condition of the south fence said "ain't no condition; ain't no fence there. Not secure for animals . . . ." Dr. George Green, Veterinarian, testified that the fence "wire was down and staples pulled out and posts rotted off and they are not animal type, particularly along a public road." Harry Ensor, a neighbor of Schusters, testified that he had "quite a bit of trouble with horses" getting in his alfalfa field and in his hay barn and that Schuster came in a truck to claim them when notified. Noah Hockersmith, who traveled Route 28 frequently, testified he was familiar with the fence and that he "never called it a fence . . . . It just looked like a bunch of shrubs". Once while driving up Route 28 he came "near hitting one of the horses" crossing toward the farm. Robert Dayhoff, another neighbor, testified that on several occasions he had seen Schuster's horses on "adjoining properties where they would have to cross the road" and "in the road once".

[sic] of the road was a 1962 Chevrolet which had run into a utility pole." Trooper Yeager testified that the horse was a "dark bay" and that he "contacted people within a reasonable distance from the scene . . . and every person . . . advised [him] that it was probably Mr. Schuster's." Trooper Yeager stated that Schuster denied ownership of the horse.

## The Charge to the Jury

In the instructions to the jury the trial court explained that Chadwick was not to be found guilty of negligence or otherwise liable to Brenda and Charles merely because Schuster may be found to be negligent. It said:

> "So even though you find negligence under issue #2 [6] as to Mr. Schuster, that doesn't mean you necessarily have to make the same finding as to Mr. Chadwick because as I say, his liability is different. The law governing his liability is different than that governing Mr. Schuster, who was the operator of the farm and in control of the farm at the time of the accident. I further want to advise you in connection with Mr. Chadwick in connection with your answer to issue #3 [7] that under the law an owner of land is subject to liability for physical harm to persons outside the land caused by the activities of the tenant after the owner transfers

---

6. Issue 2 read:

"2a. Did the defendant Schuster know or have reason to know on the date of the accident that the use which he was making of the farm would involve an unreasonable risk of harm to persons lawfully using the adjoining highway, Route 28?

"2b. If your answer to this issue is yes, was such unreasonable risk a proximate cause of the accident?"

7. Issue 3 read:

"3a. Did the defendant Chadwick know or have reason to know at the time he leased the farm to Schuster in March, 1968, that the use of the farm by Schuster would unavoidably involve an unreasonable risk of harm to persons lawfully using the adjoining highway, Route 28, and that the tenant would not cure such unreasonable risk?

"3b. If your answer to this issue is yes, was such unreasonable risk a proximate cause of the accident?"

possession to the tenant if, but only if, A, the owner at the time of the lease consented to such activity and knew that it would be carried on and B, the owner knew or had reason to know that the use by the tenant would unavoidably involve such an unreasonable risk or that special precautions necessary to safety would not be taken by the tenant. If the unreasonable risk is not a necessary consequence of the contemplated activities of the tenant and such activities could normally be conducted without creating the unreasonable danger to those outside the land by taking precautions, the owner of the land, in this case Mr. Chadwick, is not liable unless he knows or has reason to know that the tenant intends to carry on these activities without taking precautions. Accordingly, you are instructed that unless you find after considering all of the evidence that Mr. Chadwick knew or had reason to know that his tenant, Francis Schuster, intended to carry on the activity of keeping horses on the farm without taking precautions to avoid the creation of an unreasonable risk of harm to users of the highway, then Mr. Chadwick would not be liable in the case and your answer to the issue involving him, No. 3a, should be no."

The court explained further:

"Now, this deals a little bit with what I said to you earlier about Mr. Schuster not being a tenant or an agent or servant of Mr. Chadwick, and that is, . . . . . . . . I think I explained it, but maybe I should explain again. The mere fact that Mr. Schuster may have been negligent at the time of the accident in the keeping or maintenance of his farm fences wouldn't necessarily mean that Mr. Chadwick was equally negligent because as I say, any charge against him must be based upon what he knew or had reason to know in 1968 as to what the defendant would or would not do or what the

tenant would or would not do on the farm at a later date. He can't be held responsible merely because without this prior knowledge merely because Mr. Schuster may have been negligent in 1970. In other words, Mr. Chadwick is not to be found responsible under issue #3a merely because his farm may have been used in 1970 in an improper manner unless you find that this farm could not under any circumstances have been used in a reasonable and proper manner. Also, he cannot be held responsible under issue 3a unless you find that he knew or had reason to know that Mr. Schuster might fail to exercise reasonable care in maintaining the fences around the farm in a proper and safe condition bearing in mind the safety of persons lawfully on Route 28. If you should find that Mr. Chadwick neither knew nor had reason to know that Mr. Schuster would fail to maintain the fences or might fail to maintain the fences on the farm in proper repair, or if you believe that he neither knew nor in the exercise of reasonable care should have known that Mr. Schuster would permit horses to remain on portions of the farm which may not be surrounded by proper fences, then your verdict again should be no on that issue relating to Mr. Chadwick."

The charge was discussed out of the presence of the jury. Maryland Rule 554d. Counsel for Brenda and Charles excepted to the instructions with regard to issues 2 and 3. Rule 554e. At first he excepted "to the concept of submission of the case to the jury" based on § 379A of *Restatement of the Law*, Torts 2d. He excepted "especially to the concept that that apparently according to the Court covers both nuisance and negligence as far as Mr. Chadwick is concerned and especially again to the specific use of the word 'unavoidable' . . . and also, again, especially to that portion of the issue and the instruction #3 read to the jury or that special precaution is necessary to safety would not have been taken by the tenant." He referred to *Owings v. Jones*, 9

Md. 108, 117-118: "That where the owner leases premises which are a nuisance, or must in the nature of things become so by their user, and receives rent, then, whether in or out of possession, he is liable." The court interrupted:

> "My problem there is I try to avoid the use of nuisance actually because nuisance doesn't mean much really unless it is properly defined and it seemed to me this description of the factual basis for the liability of the landlord encompasses what I consider to be a nuisance."

Counsel thought that the law was that "the lessor is liable if the condition of the premises at the time of the demise is such that, when used as it was apparently intended by the parties to the lease that they should be used, injuries to third persons result. . . ." He told the court: "I think it is simply that liability in this case should be based on that kind of a statement rather than adding to it both in the issue and instructions to the jury . . . that . . . the owner knew or had reason to know that the use by the tenant would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken by the tenant." The court declined to change the language of its instruction because there was no evidence that the fencing on the farm "was completely unsafe all over. You have got to make a distinction between some of the fences and the only evidence is that a portion of them were safe and some of them were not."

Counsel for Brenda and Charles then excepted to the refusal of the court to submit issues both as to nuisance and negligence, that is "[n]egligence solely as distinguished from nuisance." He said:

> "And I say that as to Mr. Chadwick particularly, that under the circumstances where a landlord, where the question involves the duty of a landlord to persons on a public highway after he has or at the time of and after he has rented the premises to his tenant abutting on the public highway that, specifically, the law is or the question is or the issue

is whether he knew or should have known that the fencing in this case was inadequate at the time of the lease and had not properly, and that the tenant had not properly repaired the fence up to the time of the collision to make it adequate. In other words, I don't think the landlord's duty just stops toward those on the public highway at the time of the making of the lease. That he has some duty where he knows that the premises are unsafe, let's put it that way generally, at the time to see that the tenant does make the premises safe for the use for which he knows the tenant is going to use the premises. I say that because I think there is a distinction between the duty toward those on the public highway and those as the tenant or those who take under the tenant on the premises, taking into account the law of landlord and tenant, that the landlord once he leases the premises has no duty in negligence toward the tenant except where he agrees to make repairs, and then negligently fails to make repairs. I don't think that is the situation here. I think the duty towards one on the public highway is greater than one coming in under the tenant and that the duty towards one on the public highway involves not only the time of the making of the lease but also; . . . that is involved, yes, but also a continuing duty toward the public if at the time of the making of the lease there was an unsafe condition. I guess that is about as close as I can come to stating what I think the duty is."

The court did not agree that the law was as counsel stated. It said:

"I think to hold a landlord liable you must show the unsafe condition of those on the highway at the time of the making of the lease and you must also show that at that time he had no reason to believe that the tenant would not properly repair the things as required under the contractual terms of

the lease. Now if he knew or had reason to know that Schuster was not going to do what the lease required him to do, then it seems to me you can predicate your liability on it. But assuming that the premises at the time, at least one field constituted an undue risk, if the lease required Schuster to repair and to take care of the fences and do minor repairs and if Mr. Chadwick had no reason to believe that he wouldn't do them then I think he can't be held liable for any negligence. I would not grant the prayer under those terms."

Brenda and Charles contend on appeal that ". . . the failure to submit the issue as to [Chadwick's] liability and to instruct on the basis of Sec. 379 was prejudicial error warranting reversal for a new trial on the question of [Chadwick's] liability alone under proper instructions based on Sec. 379." They present the question:

"Did the trial court err in submitting the case to the jury as to the Appellee on the test for liability of the lessor for activities of the lessee on the leased premises after the leasing, as stated in Sec. 379A, rather than for a dangerous condition on the premises existing at the time of the lease, as stated in Sec. 379?"

Chadwick presents the question in a slightly different way:

"Was the trial court correct, under the facts presented, in the framing of its issues and instructions to the jury so as to indicate that the landlord would be liable only if he knew or had reason to know, at the time of the leasing to Schuster, that the intended use of the farm by the tenant would unavoidably involve an unreasonable risk of harm to users of the highway?"

*Section 379*

Comment f to § 379 points out:

"A building or other artificial condition of land

may involve risk to persons outside of land in any one or more of at least three ways:

1. The structure may be so erected as to be unreasonably dangerous no matter how carefully maintained, repaired, and used.

2. The structure may be safe if properly maintained but unreasonably dangerous because of bad repair.

3. The structure may be harmless if not used but unreasonably dangerous if used. If the structure is dangerous only if used, the lessor is not liable for harm done by the use unless the use is necessary for the purpose for which the land is leased. So too, a structure may be dangerous only if put to a particular use. If so, the lessor is not liable unless the particular use is appropriate for, and so included within, the purposes for which the land is leased."

With respect to the lessor's liability for harm suffered outside the land by persons other than lessee, it is immaterial that the lessee knew of the condition and the risk involved therein or should have discovered it when he took possession or thereafter. Comment a. A duty by the lessee to repair a dangerous condition, even by express covenant, does not affect the lessor's liability to others outside the land. Comment b. The lessor's liability attaches only when the land is leased in a dangerous condition. Comment e. Thus, § 379 concerns the *condition* of the land demised, as distinguished from the *activities* of the lessee after the demise of the land, which is the concern of § 379A.

Even if § 379 reflects the law of Maryland,[8] which we

---

8. See, however, *Owings v. Jones*, 9 Md. 108; *Albert v. State, Use of Ryan*, 66 Md. 325; *State, Use of Bashe v. Boyce*, 73 Md. 469; *Smith v. State, Use of Walsh*, 92 Md. 518; *Miller v. Fisher*, 111 Md. 91; *Longley v. McGeoch*, 115 Md. 182; *Beck & Co. v. Hanline Bros.*, 122 Md. 68; *Marshall v. Price*, 162 Md. 687; *Sherwood Brothers, Inc. v. Eckard*, 204 Md. 485; *State, Use of Bohon v. Feldstein*, 207 Md. 20; *Austin v. Buettner*, 211 Md. 61; *Leimbach v. Bickford's, Inc.*, 214 Md. 434; *Parklawn v. Nee*, 243 Md. 249. See also Rhynhart, *Notes on the Law of Landlord and Tenant*, 20 Md. L. Rev. 1, 40-44; 39 A.L.R. 2d 973.

expressly do not now decide, the trial court did not err, in the circumstances here, in refusing to submit an issue to the jury based thereon or to instruct them thereunder. It is patent that there did not exist a condition which was unreasonably dangerous no matter how carefully maintained, repaired, or used. It is clear from the evidence that the land would be in safe condition for the contemplated use if properly maintained by adequate fencing. And the evidence did not establish that the land was *unreasonably dangerous* because of bad repair. Evidence which showed that the demised land contained fields with sound fencing in which horses could be contained was not refuted. Thus, it is apparent that the fields with inadequate fencing were harmless if not used for pasturing horses but unreasonably dangerous if used. Under § 379 the lessor was not liable for harm done by the use of the land unless the use was necessary for the purpose for which the land was leased. Because there were fields on the demised land appropriate for the confinement of horses, the harm here resulted, not from a condition of the land, but from the activities of the lessee after the transfer of possession. On the evidence, therefore, Chadwick was not liable under § 379 for harm to others outside the land for the reason that he did not transfer possession in a condition which he realized or should have realized would involve unreasonable risk to them.

Over a century ago the Court of Appeals set out the basic principle evolved from numerous adjudications: "That where property is demised, and at the time of the demise it is not a nuisance, and becomes so *only* by the act of the tenant while in his possession, and injury happen during such possession, the owner is not liable." *Owings v. Jones*, 9 Md. 117-118.[9] The principle was affirmed in *Sherwood Brothers, Inc. v. Eckard*, 204 Md. 485, 494,[10] in quoting with approval *Swords*

---

**9.** The Court enunciated a second principle: "That where the owner leases premises which are a nuisance, or must in the nature of things become so by their user, and receives rent, then, whether in or out of possession, he is liable." 9 Md. at 118.

**10.** *Sherwood*, at 493-495 contains a discussion of the term "nuisance" in cases involving the condition of leased property and its relation to those on the property.

*v. Edgar,* 59 N.Y. 28: "A lessor of premises, not *per se* a nuisance, but which becomes so only by the manner in which they are used by the lessee, is not liable therefor . . . ." A defective fencing here was not a nuisance. "A nuisance exists because of a violation of an absolute duty so that it does not rest on the degree of care used but rather on the degree of danger existing with the best of care." *Sherwood,* at 493. As with the lift in *Sherwood,* the defective fencing here was not dangerous or potentially dangerous unless it was negligently used. The real danger in the defective fencing was not its disrepair, but, rather the manner of its use by the tenant. This cannot constitute a basis for holding the landlord liable. The answer to the question presented by Brenda and Charles is no, the trial court did not err in submitting the case to the jury on the test for liability of Chadwick for activities of Schuster on the leased premises after the leasing as stated in § 379A, rather than for a dangerous condition of the premises existing at the time of the lease as stated in § 379.

The answer to the question presented by Chadwick is yes, the trial court was correct, under the facts presented, "in the framing of its issues and instructions to the jury so as to indicate that the landlord would be liable only if he knew or had reason to know, at the time of the leasing to Schuster, that the intended use of the farm by the tenant would unavoidably involve an unreasonable risk of harm to users of the highway." We think it correctly reflects the Maryland law. The Court of Appeals said in *Sherwood,* at 489-490: "The general rule is that the landlord is liable for injuries to persons on the leased premises, such as guests or customers of the lessee, only to the same extent as he is to the tenant himself. Accordingly, in the ordinary case, the landlord is not liable for injuries caused by defects existing at the time of the lease except as he may have failed to inform the lessee of defects known to him, and not apparent to the lessee . . . There has been recognized an exception to this rule where the leased premises are to be used for public or *quasi* public purposes, so that large numbers of patrons may be expected to visit the premises. In such cases, the landlord has been held to an obligation to use ordinary diligence to

see that the property leased is in a reasonably safe condition at the time of the lease." We believe that "defects" as therein used are such as do not amount to a nuisance *per se.* It seems that the rule is applicable to ". . . defects and dangerous places in and about public highways where the public have the right to be." *Smith v. State, Use of Walsh*, 92 Md. 518, 534. That is, there is a duty of owners of property to protect the public against injury resulting from defects on or *appurtenant* to their premises when the public has a right to be there. *Id.*, at 529. Thus, Chadwick's liability was to be tested, not by the existence of a nuisance at the time the property was demised, but by negligence, that is ". . . the violation of a relative duty for failure to use a degree of care required under particular circumstances." *Sherwood*, at 493. The issues as framed and the instructions as given did just that.

*Judgment affirmed; appellants to pay costs.*