Robinson, J.,
¶ 19. dissenting. Although a landlord generally has no duty to third parties injured by a tenant’s animals that escape through inadequate fencing erected and maintained solely by the tenant, a landowner in possession of property does have a duty to third parties to act with reasonable care in exercising the control the landowner has over the property. Applying these principles to the facts in this case, plaintiffs evidence is more than sufficient to survive summary judgment, especially in light of the evidence that Toomey never leased the property on which the horses were pastured to Wielt, and that the property in question remained within Toomey’s possession and control. The majority’s analysis fails to recognize this evidence, and misconstrues the impact of a prior decision of this Court and various statutes on the underlying common law framework. For all of these reasons, I respectfully dissent.
I. Common Law Framework
¶ 20. A landowner who fails to exercise reasonable care with respect to the conduct of others on the land or the condition of the premises may be liable to third parties for injuries resulting *406 from the conduct or condition where the landowner knows or should have known of the conduct, and has the ability to exercise control over that conduct or condition. Several related common law rules reinforce this overarching principle, which explains most court decisions involving a landowner’s duty in cases involving harm to third parties as a result of animals escaping from premises.
¶ 21. First and foremost, a landowner (or one who possesses property) that permits another to use the land is, if present, under a duty to exercise reasonable care to prevent that person from creating an unreasonable risk of bodily harm to another if the landowner: “(a) knows or has reason to know that [the landowner] has the ability to control the third person, and (b) knows or should know of the necessity and opportunity for exercising such control.” Restatement (Second) of Torts § 318 (1965). As noted in the Restatement:
The mere fact that the possessor of . . . land permits a third person to . . . conduct an activity upon the land is not regarded as sufficient to make the possessor liable for the manner in which the third person . . . carries on the activity. It is, however, enough to require the possessor to exercise with reasonable care the ability which the possession gives to [the possessor] to control the third person’s use or activity when [the possessor] knows or should know that its exercise is necessary to prevent harm to others.
Id. cmt. a. This rule applies where the possessor of land is present when the activity is being carried on with the possessor’s permission, and when, therefore, the possessor “has not only the ability to control the conduct of the third person as possessor, but also the opportunity to do so.” Id. cmt. b. The possessor’s duty to exercise reasonable care to control the conduct of third persons for the protection of others applies not only when the possessor knows of the need to do so, but also when a reasonable person should know. Id. cmt. c. If the activity permitted on the land is dangerous only under particular conditions and in particular situations, the actor is required to exercise vigilance if there is a reasonable probability that such a condition or situation will arise. Id. In this setting, where the landowner knows of the unreasonable risk and has the ability to exercise control, the landowner *407 does have a duty of care to third parties outside the premises who are injured as a result of activities on the premises.
¶ 22. Second, in the context of leased premises, generally the landlord is not liable to others outside of the land for physical harm caused by any dangerous condition on the land that arises after the tenant takes possession, except where a landowner has agreed to make repairs. Id. § 377. This general rule reflects the reality that, unless a landowner has contracted to repair conditions on the premises, the landowner generally yields control over the condition of the premises, and over activities conducted on the premises, upon transferring possession. See, e.g., W. Prosser, Law of Torts § 63 (4th ed. 1971) (explaining that landlord is not generally liable to people injured on land or those outside of it for conditions that develop or are created by tenant, or activities carried on by tenant, after possession has been transferred because landlord surrenders both possession and control of land to lessee, retaining only reversionary interest).
¶ 23. However, a landlord is subject to liability for physical harm to people outside the land caused by activities of the tenant or others on the land after the landlord transfers possession if, but only if: “(a) the [landowner] at the time of the lease consented to such activity or knew that it would be carried on, and (b) the [landowner] knew or had reason to know that it would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken.” Restatement (Second) of Torts § 379A; see also Restatement (Second) of Prop., Land. & Ten. § 18.4 (1977) (setting forth same rule as reflected in Restatement (Second) of Torts). In other words, if a landowner leases property to another knowing that the tenant is going to carry on an activity that involves an unreasonable risk, and the landowner consents to that conduct, then the landlord has a duty to third parties to exercise reasonable care. The landowner cannot avoid this duty by disclaiming responsibility for the tenant’s planned activities in the lease; such a clause has no effect on the landowner’s duty to third persons outside of the land who are not a party to the agreement. Restatement (Second) of Torts § 379A cmt. d. This section of the Restatement recognizes that at the time the landowner transfers possession of property to another, knowing that the tenant’s activities will pose an unreasonable risk to third parties outside the property, the landowner is liable for *408 any damages resulting from the landowner’s failure to exercise reasonable care to avoid the unreasonable risk.[2]
¶ 24. Significantly, the relevant knowledge on the part of the landowner may involve not only the nature of the activity the tenant intends to carry on, but the way in which the tenant will carry it out. Take, for example, the illustrations in the Restatement: if a landowner leases property for use as a baseball park knowing that there is an unreasonable risk that in the ordinary course of a baseball game balls will be hit into the public highway in a way that is dangerous to those using it, the landowner may be liable to a driver on the public highway for injuries resulting from an errant ball. See id. cmt. c, illus. 1. However, if, at the time the landowner conveys possession of the property, the baseball diamond is laid out so that there is no risk that a ball will be hit into the highway, and the tenant subsequently reorients the baseball diamond, thereby creating an unreasonable risk of errant balls striking passing motorists, the landowner will not be liable. Id. cmt. c, illus. 2. The underlying activity — baseball — is the same in both situations. What distinguishes the landowner’s liability in the two illustrations is (1) the way in which the baseball is played — i.e., the orientation of the diamond; and (2) landowner’s knowledge at the time of the conveyance. In the first illustration, at the time of the conveyance the landowner knows or has reason to believe that the baseball will be played in a way that creates an unreasonable risk of physical harm to others outside the property. In contrast, in the second illustration the landowner has no reason to know of an unreasonable risk at the time the landowner relinquishes possession, and the associated control, of the property. In both cases, the activity to be conducted on the property is the same: baseball — an activity that in and of itself is not particularly dangerous to third parties. The critical question is not whether, at the time of conveyance, the landowner knows or has reason to know that the sport of baseball creates an unreasonable risk. Rather, the question is whether the *409 landowner knows or has reason to know that baseball will be played on the property in a way that poses an unreasonable risk to third parties outside of the property.
¶ 25. Understood together, these various rules of blackletter law reinforce the principle that the existence of a duty on the part of a landowner to exercise reasonable care to avoid harm to third parties outside the land resulting from activities conducted upon the land depends on the landowner’s knowledge of the activities and ability to exercise control with respect to those activities. This understanding helps explain the otherwise apparently disparate case law involving injuries caused by escaped animals.
¶ 26. In a case on all fours with the present case, the Washington Supreme Court upheld a jury verdict against a corporation for injuries to a motorist caused by a horse in the middle of a highway where the corporation had allowed an employee to keep a horse on the company’s property. Misterek v. Wash. Mineral Prods., Inc., 531 P.2d 805, 806 (Wash. 1975) (en banc). After concluding that various statutes did not displace the common law, and eschewing the need to explore common law rules specifically relating to animals, the court concluded that the case could be resolved “upon the general principles of negligence.” Id. at 807. The court relied on the general principle that one must maintain property so as not to injure those using the adjacent highway. Id. Although the company had conditioned the employee’s use of the property to pasture his horse upon the employee repairing and maintaining the fence, there was substantial evidence that the company knew that the fences needed attention, that the horses were on its land, and that the land adjoined a public highway. Id. On these bases, the court affirmed the jury’s verdict against the company. Id.
¶ 27. Wandering livestock cases involving landowners and tenants, while not directly applicable here for reasons set forth more fully below, also support the general principle that a landowner’s duty depends on the landowner’s knowledge and control of the premises or activities giving rise to an unreasonable danger. In Larson-Murphy v. Steiner, the Montana Supreme Court considered whether a landowner could be held liable for damages resulting from a tenant’s escaped bull, which was struck by a motorist traveling on the adjacent highway. 2000 MT 334, 15 P.3d 1205, superseded by statute as stated in Knapton ex rel. E.K. v. Monk, 2015 MT 11, ¶ 13 n.2, 347 P.3d 1257. The court acknowl *410 edged the general rule that a landowner is not responsible to people injured on or off the land for conditions that develop or are created by the tenant after possession has been transferred. Larson-Murphy v. Steiner, 2000 MT 334, ¶ 103. However, citing Restatement (Second) of Torts § 379A, it also noted that a landowner is liable for physical harm to people off the land caused by activities of the tenant or others on the land if, at the time of the lease: (1) the landowner consents to the activity or has reason to know that it will be carried on; and (2) the landowner knows or has reason to know that the activity would unavoidably involve an unreasonable risk or that special precautions necessary to safety would not be taken. Id. ¶ 104. The court noted the related common law doctrine that a lessor is subject to liability for a nuisance caused by an activity carried upon the land while the lease continues if the lessor would be liable for carrying on the activity, at the time of the lease the lessor consents to the activity or knows it will be carried on, and the lessor knows or should know that the activity will necessarily involve or is already causing a nuisance. Id. Because the landowner in Larson-Murphy knew that the tenants would be keeping livestock, including bulls, and was aware of the potential risks involved as evidenced by the landowner keeping livestock himself and requiring the tenant to carry liability insurance in anticipation of any damages the livestock may cause, the court reversed the trial court’s award of summary judgment to the landowner. Id. ¶ 108. Significantly, the court rejected the argument that because the lease agreement required the tenants to maintain the fences and take whatever precautions were necessary for keeping the animals, the landowner was not liable to a third party. Id. ¶ 107. The court explained, “While such contractual obligations may give [landowner] a right to indemnification from [tenants], we conclude that an injured third party ... is not party to such an agreement, and thus [landowner] cannot avoid liability if a legal duty was owed.” Id. ¶ 108.
¶ 28. Similarly, in Gonzales v. Bierman, the Colorado Court of Appeals reversed an award of summary judgment to a landowner in a claim by plaintiffs who were injured when their car struck a horse owned by the landowner’s tenant. 773 P.2d 629, 630 (Colo. App. 1989). In reaching its conclusion, the court cited § 379A and pointed to evidence that when the landowners transferred possession of the land to the tenant, they knew that the tenant kept *411 horses on the land and knew or had reason to know that the fences on the land were in poor condition. Id.
¶ 29. In contrast, the Iowa Court of Appeals in Byers v. Evans considered a claim against a landowner by an individual who was injured when his car hit a swine that had escaped from pens on the adjacent land. 436 N.W.2d 654, 655 (Iowa Ct. App. 1988). The tenant had constructed the pens and fences at issue after taking possession of the property pursuant to the lease. Id. at 656. The court explained that when the landowner transferred possession of the property, the landowner surrendered possession and control along with the associated responsibility to people injured on or off the land. Id. Because the plaintiff had not alleged facts showing that at the time the landowner transferred possession the landowner knew or had reason to know that tenant’s activities would unavoidably involve such an unreasonable risk, or that special precautions necessary to safety would not be taken, the court affirmed the trial court’s dismissal of the action. Id. at 657; see also Edwards v. Chadwick, 321 A.2d 792, 799-800 (Md. Ct. Spec. App. 1974) (where landowner conveyed land to tenant with sound fencing in which horses could be contained, trial court properly instructed jury that landowner could be liable only if landowner knew or had reason to know, when transferring property pursuant to lease, that intended use of farm by tenant would unavoidably involve unreasonable risk of harm to users of highway); Flint v. Snow, 439 P.2d 610, 611 (Or. 1968) (landowner could be liable to injured driver if jury found that he retained some control over pasture from which horse escaped by breaking through fence).
¶ 30. Likewise, courts’ rulings in cases in which a tenant’s dog has bitten a third party outside the leased property have generally turned on an analysis of what the landowner knew, and what degree of control the landowner could exercise. For example, in Park v. Hoffard the Oregon Supreme Court in a unanimous decision considered whether a landowner was liable for injuries to a child on a neighboring property caused by the tenant’s dog. 847 P.2d 852, 852-53 (Or. 1993) (en banc). Reviewing the Restatement (Second) of Torts § 379A, as well as its own related caselaw, the court concluded that a landowner can be liable for such injuries if two conditions are satisfied:
(1) the landlord, at the time of entering into a lease, at the time of renewing a lease or a periodic tenancy, or at *412 any time during a tenancy at will or other tenancy that the landlord is able to terminate unilaterally, consents to such activity or knows that it will be carried on, and (2) the landlord knows or has reason to know that the activity will unavoidably involve an unreasonable risk of harm to persons off the rental property.
Id. at 855. The Oregon Supreme Court concluded that a jury could find that the landlord consented to or knew that tenant had a dog that would unavoidably involve an unreasonable risk of harm to people off the rental property based on evidence that: (1) the tenancy was a month-to-month tenancy; (2) the landlord was aware of the sign posted on the rental property that warned of a dangerous dog; and (3) the landlord was aware that the tenant’s dog had previously bitten another child.[3] Id. at 856. The court accordingly affirmed the intermediate court’s reversal of the trial court’s award of summary judgment. Id.
¶ 31. Similarly, in Strunk v. Zoltanski, the New York Court of Appeals recognized that in such cases “to establish liability it must be shown that the [landowner] had knowledge of the vicious propensities of the dog and had control of the premises or other capability to remove or confine the animal.” 468 N.E.2d 13, 15 (N.Y. 1984) (citation omitted). In affirming the trial court’s denial of summary judgment for the landowner, the court cited evidence that the landlord knew that the tenant planned to keep a vicious dog on the property at the time landlord rented the property to tenant and failed to exercise reasonable care in connection with that risk. Id. at 15-16.[4]
*413 ¶ 32. In all of the above cases, the critical question was: What knowledge of the risk did the landowner have at the time the landowner had the ability to take action to avoid or mitigate the risk?
II. Application to the Evidence in this Case
¶ 33. Construing the evidence in the record in the light most favorable to plaintiffs claim, Rubin v. Town of Poultney, 168 Vt. 624, 625, 721 A.2d 504, 506 (1998) (mem.), he has more than sufficient evidence to avoid summary judgment and get to a jury. I focus in particular on two clusters of evidence: (1) evidence that Toomey never transferred possession of the property that was inadequately fenced to the possession and control of Wielt, and thus, throughout the period leading up to plaintiffs injuries, retained the degree of control of the property that is a prerequisite to liability; and (2) evidence that, while retaining the ability to control activities on the property, Toomey was fully aware of the state of the fencing.
¶ 34. With respect to the first cluster, the jury could conclude that the horse escaped from a temporary enclosure on 1952 Haiwood Hill. In fact, in his motion below, Toomey asserts that the fact that the horse hit by plaintiff was pastured on the 1952 Haiwood Hill lot on the day of the accident is undisputed.
¶ 35. There is ample evidence that Toomey never leased the undeveloped 1952 Haiwood Hill property to Wielt: Toomey’s lease with Wielt only references the property at 1900 Haiwood Hill, makes no mention of pasturing horses, and did not include the *414 1952 Harwood Hill property. Wielt testified that the property she rented included the main house at 1900 Haiwood Hill and included limited access to an associated temporary structure that was not on the 1952 Haiwood Hill property. Again, Toomey has identified this as an undisputed fact. The evidence suggests that Toomey did not lease the 1952 Harwood Hill property to Wielt for the purpose of pasturing her horses, but, rather, allowed her to pasture her horses on the 1952 Haiwood Hill property by permission. As Toomey’s statement of undisputed facts reflects, “Toomey allowed Wielt to pasture her horses in a south pasture on 1900 Haiwood Hill Road and a north pasture on 1952 Haiwood Hill Road.”
¶ 36. Accordingly, an abundance of evidence supports the conclusion that Toomey retained possession and control of the 1952 Haiwood Hill property through the date of the accident. The jury could conclude that, at most, Toomey extended to Wielt an open-ended, nonexclusive, permissive license to pasture her horses on his 1952 Haiwood Hill property. In fact, that is probably the only conclusion the jury could reach on this record. Wielt’s continuing pasturing of horses on the 1952 Haiwood Hill property depended on Toomey’s continuing consent to that arrangement. For that reason, this is not a landowner-tenant case, and the central consideration that infuses the applicable rule in those cases — that a landowner yields control over a property upon delivering it to a tenant pursuant to a lease — does not apply here. Instead, this case is most like the Washington Supreme Court’s decision in Misterek, in which an employer allowed an employee to pasture horses on company property on the condition that the employee maintain adequate fencing. 531 P.2d at 806. Toomey gave Wielt permission to pasture her horses on the 1952 Haiwood Hill property, retained his possession and ability to control that property throughout the period leading up to the accident, and at any time could have revoked his permission or required Wielt to erect a more secure enclosure.
¶ 37. The fact that Toomey required Wielt to ensure adequate fencing for the horses as a condition of her use may give rise to an obligation to indemnify him, but does not alter his obligations, as a landowner in possession and control of the property, to third parties. See Restatement (Second) of Torts § 379A cmt. d (providing that in landowner-tenant context, landowner cannot avoid duty of care to third parties by disclaiming responsibility for *415 dangerous activities in the lease); Larson-Murphy v. Steiner, 2000 MT 334, ¶ 108 (stating that in landowner-tenant context, tenant’s contractual obligations relating to fencing livestock may give landowner right of indemnification, but cannot absolve landowner of liability to injured third party who was not party to agreement).[6]
¶ 38. The second critical factor in the assessment of Toome/s duty is the extent to which he was present and had knowledge of the activities conducted, with his permission, on his 1952 Haiwood Hill property. Based on the evidence relating to the fencing, the jury could find that the enclosure boundary was within fifteen feet of a public highway; that the enclosure consisted of temporary electric fencing; that it consisted of fiberglass posts driven a few inches into the ground, with two strands of wire strung between them; that only a single strand of wire enclosed the gate to the enclosure; that there was significant slack in the fence wires and some fiberglass posts leaned over and, on some occasions, fell over; that the electric fence wires would sometimes touch grass or other foliage, thereby reducing its ability to contain the horses; and that the fence was three to four feet high.[5]
¶ 39. The record includes evidence that Toomey lived on the property adjacent to the 1952 Haiwood Hill property, and that his gravel driveway to Route 7A passed right by the 1952 Haiwood Hill property enclosure. Wielt testified that Toomey would have seen the horse pasturing “any time he was in the vicinity.” In fact, Toomey testified that he walked past the horse pastures on his *416 way to the grocery store “almost daily,” often stopping to feed the horses apples as he passed. The fence at 1952 Haiwood Hill was installed within ten to fifteen feet from the southbound lane on Route 7A — the major road by which Toomey accessed his home. On the basis of this evidence, a jury could have concluded that Toomey had knowledge of the way in which the pastured horses were contained on the 1952 Haiwood Hill property, and the condition of the fencing.
¶ 40. Given that the jury could conclude that Wielt’s activities on the 1952 Haiwood Hill property depended upon Toomey’s continuing consent, because Toomey maintained possession and control of that property, and given Toomey’s knowledge of Wielt’s activities there — including the condition of the fencing — I cannot agree with the majority that Toomey is entitled to summary judgment on the question of duty. Basic principles of tort law compel the opposite conclusion.
III. The Majority’s Analysis
¶ 41. The majority opinion misses the mark both on the facts and the law. With respect to the facts, the majority’s failure to recognize the significance of Toomey’s continuing possession and control over the 1952 Haiwood Hill property undermines much of its analysis. With respect to the law, the majority’s conclusion that, notwithstanding these common law principles of landowner liability, only the owner of an animal can be liable in tort for injuries resulting when the animal is negligently allowed to wander at large, is not supported by the cases or statutes relied upon.
¶ 42. On the factual question, if this were a case in which Toomey, as landowner, had transferred possession of the property to Wielt, as tenant, pursuant to a lease for a specified term, and subject to an agreement that Wielt would construct and maintain adequate fencing for her horses on the leased premises, the majority’s analysis might make more sense. The majority clearly frames the case this way. See ante, ¶ 8 (“Our question on appeal is: What duty, if any, runs from Toomey, as noncustodial landowner, to plaintiff?”). But the undisputed evidence does not support this narrative. As a consequence, much of the majority’s analysis misses the mark.
¶ 43. For example, the majority focuses on the question whether the activity of pasturing horses creates an unreasonable risk. If *417 Toomey had transferred possession of the property in question to Wielt knowing only that she would be pasturing horses there, the key questions would be whether at the time Toomey transferred possession of the property to Wielt he both consented to her pasturing the horses there and knew or had reason to know that (1) pasturing horses as a general proposition unavoidably involves an unreasonable risk, or (2) that Wielt would not take the necessary precautions. But Toomey never did transfer possession of this property to Wielt. He retained control of the property through the night of the accident. Given this fact, the right question in determining whether he had a duty of reasonable care to third parties off the property is whether he knew how Wielt was fencing the horses.
¶ 44. Likewise, the majority’s assertion that Toomey has “no connection to the ownership, management, or control of the injurious horse or of the fence containing it,” ante, ¶ 18, simply isn’t true where he not only owns but possesses and controls the property on which the pastured horses were purportedly enclosed by the fence. And the statement that “requiring a landowner to regularly walk a tenant’s property and check the condition of the fence would distort the contractual relations between landlord and tenant beyond reasonable bounds,” ante, ¶ 18, implies a landlord-tenant relationship that doesn’t exist. Toomey has maintained possession of this property, and in so doing, has retained the obligation to take reasonable care with respect to activities he allows on his property. See Restatement (Second) of Torts § 818 cmt. a (requiring possessor of land to exercise with reasonable care ability which possession gives possessor to control third person’s use or activity when possessor knows or should know that its exercise is necessary to prevent harm to others).
¶ 45. Finally, to the extent that the cases relied upon by the majority are conceivably relevant to this case at all, they fit a factual scenario that does not match the evidence in this case. The case that comes closest to this one, insofar as it involves the duty of a landowner in connection with livestock pastured on the landowner’s property, fits the paradigm relied upon by the majority, but is inconsistent with the evidence. In Blake v. Dunn Farms, Inc., the landowner had not, in leasing the property, contemplated a use that required fencing, lived far away from the property, and had no knowledge of the bad condition of the fences, while the errant horse was owned by a sublessee. 413 *418 N.E.2d 560, 565-66 (Ind. 1980). In that case, the landlord had neither the control nor the knowledge necessary to establish a duty.
¶ 46. The case of Clauson v. Kempffer is a step further from the wandering-animal cases, and instead involves a straightforward dangerous-condition-on-the-land, but likewise fits the mold of a true landowner-tenant case. 477 N.W.2d 257, 257-58 (S.D. 1991). In that case, a landowner leased property to a tenant for a six-month term. There was a private road across the property that had formerly been a forest service road used by the public to gain access to public land. After the landowner conveyed possession of the land, the tenant constructed a fence on the property that included a single smooth strand of wire strung across the road. A motorcyclist driving on the private road lost control of his motorcycle upon encountering this hard-to-see obstacle, and suffered injuries. The court concluded that even though the landowner had knowledge of the dangerous condition, he did not have the necessary control. Id. at 259-60. In particular, the court held that because the lessee created the danger after the lessor conveyed the property — when the lessor no longer retained any control over the premises, had no right of reentry, and had no reserved right to control what activities were performed on the land or how they were conducted — the lessor could not be held liable for the motorcyclist’s injuries. Id. The case has nothing to do with the obligation of landowners with respect to wandering animals, as suggested in the majority opinion. To the extent that it deals more generally with landowner liability for dangerous conditions created by a tenant, the court’s analysis is entirely consistent with the analysis above.[7]
*419 ¶ 47. With respect to the majority’s legal reasoning, it offers a purported rule of law that is not supported by the case or statutes cited in support. In particular, the majority concludes that only a horse’s “owner or keeper” may be liable in a civil action for damages suffered as a result of a horse’s escape. Ante, ¶ 10. Neither our prior decision in Wright v. Shedd, 122 Vt. 475, 177 A.2d 240 (1962), nor the statutes governing the fencing of animals cited by the majority, support the conclusion that Vermont has excepted the keeping of animals from the general common law obligations of landowners outlined above.
¶ 48. The Wright case simply doesn’t address the issue. In that case, this Court reversed the trial court’s directed verdict for both husband and wife in connection with a claim by a driver who was injured upon colliding with a horse on the road. There was evidence that the husband owned the horse and that the enclosure for the horse was inadequate. The court did not cite any evidence whatsoever concerning the wife. In upholding the directed verdict for wife, this Court said “there is nothing in the evidence to connect her with the ownership, management or control of the horses that were involved in the accident.” 122 Vt. at 477, 177 A.2d *420 at 242. From this passing statement, the majority infers that this Court held that only the owner of a horse, or a party charged with controlling the horse, could be held liable for injuries to third parties. Ante, ¶ 9. I don’t see how that conclusion follows. The majority seems to assume that the “ownership, management or control” of a horse referenced in the Wright opinion does not encompass ownership and control over the land on which the horse is housed. That suggestion, directly at odds with the well-established common law principles set forth above, requires a substantial leap. There is nothing in the Wright decision to suggest the wife owned the property on which the horses were pastured, or that any party even argued wife had a duty of reasonable care on the basis of her ownership and control of the property on which the horse was ineffectively pastured.
¶ 49. Likewise, there are two critical problems with the majority’s claim that various statutes relating to wandering livestock reflect a legislative intent to limit civil liability for personal injury damages caused by an escaped horse to the horse’s owner. Ante, ¶ 10. First, the majority assumes that because the Legislature has imposed statutory obligations accompanied by civil fines on owners or keepers of certain animals that wander upon the lands or premises of another, it intended to preempt the common law with respect to any other class of individuals who may have duties of care in connection with the enclosure of those animals. That assumption runs counter to the principle that “[t]he common law is changed by statute only if the statute overturns the common law in clear and unambiguous language, or if the statute is clearly inconsistent with the common law, or the statute attempts to cover the entire subject matter.” Langle v. Kurkul, 146 Vt. 513, 516, 510 A.2d 1301, 1303 (1986); see also E.B. & A.C. Whiting Co. v. City of Burlington, 106 Vt. 446, 464, 175 A. 35, 44 (1934) (“[R]ules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language.”). The bare fact that the Legislature has imposed civil fines on livestock owners for allowing their animals to wander, and has held them responsible for damage resulting therefrom, does not support the majority’s assertion that the Legislature intends that only a *421 horse’s owner should be held liable in a civil action for personal injury damages suffered as a result of a horse’s escape.[8]
¶ 50. Consider, for example, the case of Sutton v. Duke, 176 S.E.2d 161, relied upon by the majority. In that case, a railroad agent negligently left open a gate at a property to which the railroad made a delivery through a rail spur. The escape of a pony from its enclosure as a result of this negligence ultimately led to an injury to a motorist. If, as the majority suggests, the only party that can be held liable for damages caused by livestock that escapes its enclosure is the person who owns the livestock, the railroad would be immune from suit. Or consider a commercial stable that houses horses for multiple clients. Under the majority’s view, the stable would have no enforceable duty of care to third parties injured as a result of the horses’ escape. That doesn’t make sense.
¶ 51. The second flaw in the majority’s reliance on these statutes regulating farmers’ pasturing of livestock in an agrarian society is that the statutes have nothing to do with liability in tort for personal injuries to passing motorists injured as a result of animals on the highway. The statutes appear in a subchapter regulating the control of animals. The subchapter has several provisions, including one relied upon by the majority, exclusively regulating roaming by adult, male, uncastrated livestock — provisions clearly designed to prevent those animals from impregnating or otherwise injuring fellow farmers’ livestock.[9] With respect to cattle, horses, sheep, goats, or swine more generally, the *422 subchapter establishes varying fines for allowing livestock to run in a public highway or yard belonging to a public building without the consent of the selectboard, 20 V.S.A. § 3341 ($3.00 — $10.00 fine); in public parks, commons or greens without the permission of the selectboard, id. § 3342 ($5.00 — $25.00 fine); enclosed townhouses, churches or schoolhouses, id. § 3343 ($3.00 — $10.00 fine); and enclosed burial grounds, id. § 3344 ($25.00 fine). The title of the remaining provision in this subchapter reflects that it relates to the only category of property not subsumed within the prior several sections: “Land or premises of another.” 20 V.S.A. § 3345. That provision, which the majority contends supports its view that the Legislature has limited tort liability for roaming horses to the horses’ owners, provides:
A person who knowingly permits his cattle, horses, sheep, goats, swine, or domestic fowls to go upon the lands or premises of another, after the latter has given the owner notice thereof, shall be fined not more than $10.00 nor less than $2.00. Such person shall also be liable for the damages suffered which may be recovered in a civil action.
This provision, and the statutes within the subchapter on enclosing livestock, cannot be said to carry the weighty significance the majority assigns to it.
¶ 52. First, the title of this section relied upon by the majority, “Land or premises of another,” reflects that it does not even apply to livestock roaming on public highways. “We have long held that the title of a chapter, subchapter, or section, as well as the statute’s purpose, may be considered in interpreting a statute.” State v. Hurley, 2015 VT 46, ¶ 11, 198 Vt. 552, 117 A.3d 433. The fact that the subchapter includes a different subsection specifically addressing the consequences of cattle, horses, or other specified livestock roaming onto a public highway without the consent of the selectboard further undermines the suggestion that § 3345 *423 provides clues as to the Legislature’s intent concerning injuries to drivers on public highways as a result of unenclosed livestock. See In re Preseault, 130 Vt. 343, 346, 292 A.2d 832, 834 (1972) (holding that statutes pertaining to the same subject “are to be construed with reference to each other as parts of one system”). The section relied upon by the majority cannot carry the water the majority ascribes to it.
¶ 53. Second, the provision in this subchapter that does address horses running at large in a public highway provides: “A person who knowingly permits cattle, horses, sheep, goats, or swine to run at large in a public highway . . . without the consent of the [selectboard,] shall be fined not more than $10.00 nor less than $3.00.” 20 V.S.A. § 3341. The fine authorized by the provision is not limited to the owner of the wandering animal, but extends to any person who permits the animal to run at large. The provision allows livestock to wander on public highways with the permission of the selectboard. It says nothing about civil liability for personal injuries caused by the wandering livestock, and the maximum fine is $10.00. Nothing about this statute supports the bald assertion that the Legislature intended that only a horse’s owner or keeper should be liable in a civil action for damages suffered as a result of a horse’s escape. Ante, ¶ 10.
¶ 54. Finally, the subchapter as a whole assigns varying consequences for allowing livestock to roam outside of enclosures. Some provisions assign consequences to owners, some to “owners and keeper,” and some to any person. Some include only fines, while some contemplate liability for civil damages. The consequences of an unenclosed, wandering animal vary depending on the location of the wanderings and whether the animal is an uncastrated adult male. None of these distinctions translate into sensible tort law concepts. As a whole, this subchapter tells us nothing about the Legislature’s intent concerning civil liability for personal injury damages suffered by drivers on public highways who encounter unenclosed livestock. See Larson-Murphy v. Steiner, 2000 MT 334, ¶ 28 (concluding that laws governing owners’ obligations with respect to fencing livestock “have little or nothing at all to do with the legal relationship between livestock owners and motorists under a theory of negligence”); see also Jacobs v. Stover, 243 N.W.2d at 644 (noting statutes dealing with rights and duties of adjoining landowners toward each other for trespassing farm animals have no application to tort claim by driver injured by farm animal in public road).
*424 ¶ 55. I spill so much ink on this analysis because of the troubling implications of the majority’s suggestion that only the owner of a farm animal can be liable in tort to a driver injured on a public highway when the animal escapes. In so holding, the majority does far more than merely shield landlords from liability for inadequate fencing of livestock by their tenants. Wholly apart from the landowner-tenant context, the majority’s apparent holding would shield property owners who do not own the animals on their property from any duty to maintain adequate enclosures — or any enclosures at all[10] — when they permit the pasturing of animals on their land, even if they retain exclusive possession and control of that land. This position would leave Vermont’s common law relating to such cases far outside of the national mainstream. And, it could severely limit the remedies available to individuals who suffer grievous injuries as a result of the negligence of landowners or other possessors of land who fail to take reasonable care in managing the pasturing of animals on their land. Such a dramatic departure from ordinary common law tort principles should not be inferred lightly — especially not through negative implication from a decision and statutes that do not actually address the question.
¶ 56. For the above reasons, I respectfully dissent.

 Likewise, a landowner who transfers possession to a tenant in a condition which the landowner realizes, or should realize, will involve unreasonable risk of physical harm to others outside of the land is subject to the same liability for that physical harm as if the landowner had remained in possession. Restatement (Second) of Torts § 379. At the time the landowner transfers possession, the landowner has both actual and constructive knowledge of the unreasonable risk, along with the legal ability to take steps to mitigate it.

 In contrast to livestock, whose escape from enclosures and presence on public highways can pose serious danger to the traveling public without regard to a particular animal’s vicious propensities, the escape of a dog from private property is not generally, in and of itself, considered dangerous. See, e.g., Trujillo v. Carrasco, 318 S.W.3d 455, 460 (Tex. App. 2010) (noting not reasonably foreseeable that escaped Labrador dog would destroy fence and kill neighbor’s roosters based solely on dog’s escape). The dog-bite cases require consideration of an additional element — the landowner’s knowledge of the dog’s dangerous propensities. Despite this distinction, these cases reinforce that the landowner’s (1) knowledge; and (2) ability to exercise control (generally by declining to renew or continue the lease) are the critical factors in the analysis pursuant to Restatement (Second) § 379A.

 See also Uccello v. Laudenslayer, 118 Cal. Rptr. 741, 748 (Ct. App. 1975) (holding that because landowner knew of vicious propensities of tenant’s dog and could have abated danger by terminating tenancy upon two weeks’ notice, minor child bitten by dog had cognizable claim); Vigil v. Payne, 725 P.2d 1155, 1157 (Colo. App. 1986) *413 (reversing trial court’s dismissal of claim against landowners by minor plaintiff who had been attacked by tenants’ dogs on leased premises because allegations that landowners had knowledge of vicious actions of tenants’ dogs before entering into lease was sufficient to establish duty of care); Stokes v. Lyddy, 815 A.2d 263, 280-81 (Conn. App. Ct. 2003) (affirming summary judgment for landowners where uncontroverted evidence was landowners did not know about tenants’ intention to keep dog, tenants never sought permission to do so, and there was no evidence that at inception of lease landowners knew of tenants’ dangerous activity or had reason to know that it would involve unreasonable risk); Solesky v. Tracey, 17 A.3d 718, 739-40 (Md. Ct. Spec. App. 2011) (reversing award of summary judgment to landowner in suit on behalf of child injured off property by tenants’ dog where evidence supported inferences that landowner was aware of vicious tendencies of tenants’ dog and could have exerted control over dangerous condition by, prior to signing lease, requiring tenants to take measures to ensure that dog would be adequately confined or by refusing to relet premises if they were unwilling to abate danger).

 I emphasize the fact that Toomey retained possession of the 1952 Harwood Hill property because that is apparently the property from which the horse escaped its enclosure. I do not mean to suggest that if the horse had escaped from the enclosure at 1900 Harwood Hill I would affirm summary judgment for defendant. The lease in this case appears to be a month-to-month lease, meaning Toomey had the ability to assert control over use of that property each time he renewed the lease. The analysis with respect to this parcel would be different, but the outcome would not. See Park v. Hoffard, 847 P.2d at 855 (noting landowner may be liable because of “special relationship” arising from landowner’s “ability to control the activities of the tenant” through deciding whether to renew lease).

 The focus of this appeal is the question of whether Toomey had a duty to plaintiff. Whether, assuming that he had a duty to third parties to take reasonable care with respect to the way horses were pastured on his land, these facts are sufficient to show a lack of reasonable care will be a question for the jury. This is sufficient evidence of an unreasonable risk to get to the jury on the question whether Toomey breached his duty of reasonable care, but may not compel the conclusion that he did.

 The other two cases relied upon by the majority are completely inapposite. In Jacobs v. Stover, 243 N.W.2d 642 (Iowa 1976), two adjoining landowners, the Stovers and the Stallmans, could not agree on the maintenance of the boundary fence between their properties. Pursuant to state law, fence viewers ordered the Stovers to maintain the north half of a boundary fence and Stallman the south half, and required them to do so by a specified date. Before that deadline, while the repairs were underway, one of the Stovers’ horses wandered from the Stovers’ property onto the Stallmans’s across a point on the fence line that the Stallmans had been ordered to maintain. From the Stallmans’ property, the animal went on to the public road, where the accident occurred. The issue before the court in the decision cited by the majority is whether the Stallmans, who neither owned the horse nor the land on which the horse was housed, but who had a statutory obligation to maintain a boundary fence between their own property and their *419 neighbors’ property by a date that had not yet arrived, could be liable for the injuries. The case has nothing to do with the issues before us in this appeal.
Likewise, in Sutton v. Duke, 176 S.E.2d 161 (N.C. 1970), the only analysis that is conceivably relevant to this case undermines the majority’s assertion that only a person that owns an animal is liable for injuries caused by its escape. The complaint in that case alleged that a landowner and a railroad company that delivered fertilizer inside a fenced area on the landowner’s property through a rail spur that passed through a gate on the landowner’s property negligently left open the gate. Due to this negligence, a pony that was enclosed inside the gate escaped. The pony then ran about five hundred yards, across a road, to an enclosure where another person kept four mules. The pony agitated the mules to the point that the mules broke out of their enclosure. A driver encountered the mule on the road about three quarters of a mile from its enclosure. Because he encountered the mule just as another car was passing, he was unable to avoid the mule. The driver suffered serious injuries in the collision. The question before the court on the defendants’ motion to dismiss had nothing to do with the obligation of a landowner with respect to inadequate fencing of animals on the owner’s property. Instead, the court assumed that both the landowner and the rail company could be liable for negligently leaving the gate open. The question before the court was whether the plaintiff could establish proximate cause given the attenuated causal connection between the negligence that allowed the pony to escape its enclosure and the damage to the plaintiff on account of the mule’s escape. Id. at 168-69. The court expressed skepticism, but concluded that the complaint could survive a motion to dismiss. The decision offers no insights relevant to the issue in this case.

 The majority asserts that the Legislature intended for liability to extend to a horse’s “owner or keeper,” ante, ¶ 10, but the statute it relies upon in connection with this case, 20 V.S.A. § 3345, only references the obligations of an “owner.” A different statute, whose scope is limited to the wanderings of uncastrated adult male horses, applies to both owners and keepers, but has no application here. See 20 V.S.A. § 3349(a). The logical conclusion of the majority’s premise that these statutes relating to the fencing of horses limit the scope of civil tort liability is that only a horse’s owner may be liable in tort for injury caused when the horse escapes — unless the horse is an adult, uncastrated male, in which case the keeper may also be liable. That distinction makes no sense as a matter of tort law.

 See 20 V.S.A. § 3346 (“The owner or keeper of a bull may be fined ... if such bull is more than nine months old and found unattended outside the premises owned or occupied by the owner or keeper of such bull and shall be liable to a party damaged by such bull while outside the premises of such owner or keeper.); id, § 3347 (making ram’s owner or keeper liable for damages resulting from ram’s going at large between August 1 and December 1 in each year, and if during such time ram is found with sheep other than those of his owner and not in his *422 enclosure, owner or keeper of such sheep may recover $5.00 of ram’s owner or keeper); id. § 3348 (requiring that rams be marked and providing compensation for person taking and securing ram at large between August 1 and December 1); id. § 3349 (stating owner or keeper of stallion more than one year old may be fined and liable for damage done for negligently allowing stallion to run at large, and may be fined for keeping stallion in a private enclosure between April 1 and December 1 in a manner that disturbs adjoining landowner).

 The undeniable consequence of the majority’s conclusion that the landowner has no duty of reasonable care to third parties off the land with respect to the enclosure of horses pastured, with the landowner’s permission, thereon is that even if Wielt had not erected any fence at all, but had relied on her horses’ general tendency to stay close to home, and even if Toomey was fully aware of this, he would not be subject to potential liability.